Filed 7/24/13  P. v. Lagunas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

VANESSA LAGUNAS et al.,

    Defendants and Appellants.

E054693

(Super.Ct.No. RIF136999)

OPINION

APPEAL from the Superior Court of Riverside County.  Helios (Joe) Hernandez, Judge.  Affirmed.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant, Vanessa Lagunas.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant, Denetric Adams.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant, Ricardo Lagunas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

1

General, Julie L. Garland, Assistant Attorney General, Lise S. Jacobson, and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

During a single trial, with separate juries for each defendant, Vanessa Lagunas, Ricardo Lagunas, and Denetric Adams (defendants) were convicted of first degree murder for luring, ambushing, and shooting Vanessa's[1] boyfriend, Mark Enoch (Pen. Code, § 187, subd. (a)[2]). Ricardo's jury also found true that Ricardo personally discharged a firearm (§ 12022.53, subd. (b)) and committed the special circumstance of murder by lying in wait (§ 190.2, subd. (a)(15)). Denetric's jury found true that Denetric personally discharged a firearm, causing death to another, not an accomplice (§ 12022.53, subd. (d)), and committed the special circumstance of murder by lying in wait (§ 190.2, subd. (a)(15)) and felony murder (§§ 211, 190.2, subd. (a)(17)(A)). Vanessa's jury found true allegations that she was a principal, and at least one other principal was armed with a firearm (§ 12022, subd. (a)(1)).

The trial court sentenced Ricardo to life without the possibility of parole, plus 10 years for the firearm enhancement. Denetric was sentenced to life without the possibility of parole, plus an indeterminate term of 25 years to life for the firearm enhancement. The

---

[1] To avoid confusion, we will use first names in this opinion, with the exception of Benjamin Lopez, Carlos Aguilar, and Deputies Joshua Cail and Ryan Bodmer.

[2] Unless otherwise noted, all statutory references are to the Penal Code.

trial court sentenced Vanessa to an indeterminate term of 25 years to life, plus one year for the firearm enhancement.

Defendants each individually appeal, raising numerous claims of instructional error, evidentiary error, improper use of shackles during trial, and cumulative error. As explained below, we conclude there was no prejudicial or cumulative error, and affirm the judgment as to each defendant.

II

FACTS

During the summer of 2006, Mark Enoch began a relationship with Vanessa. Mark lived with his mother, Nancy, and Vanessa lived in an apartment with Denetric, Anthony Vaughn, and another man. Vanessa's brother, Ricardo, sometimes visited Vanessa.

In January 2007, Denetric called Nancy Enoch and told her he was Vanessa's boyfriend. He told Nancy that if Mark did not leave Vanessa alone, Denetric was "going to kill him and the whole family," and blow up Mark's car. Vanessa was pregnant at that time. Denetric insisted he was the father of Vanessa's baby, and said he could cause a miscarriage if he wanted to. Nancy took the threats seriously but did not call the police because she feared this would make matters worse. A few days later, Nancy told Mark about the call. Mark told Nancy not to worry, and said, "It's all talk."

In April 2007, Vanessa requested that Nancy accompany her during a trip to visit Vanessa's grandmother in Norwalk. During the trip, Vanessa complained that she did not want to be burdened by a child and offered to let Nancy raise her baby. Vanessa also

3

told Nancy that Ricardo did not like "[W]hite guys." Therefore Vanessa could not introduce Ricardo to Mark and Mark had to be careful. During the evening of May 24 or 25, 2007, Nancy overheard Mark arguing with Vanessa on the phone. Mark told Vanessa he would no longer pay her cell phone bill.

During the evening of May 25, 2007, Ricardo drove to Vanessa's apartment, accompanied by Benjamin Lopez and Carlos Aguilar. According to Aguilar, upon arriving at Vanessa's apartment, he heard defendants talking about robbing, shooting, and killing Vanessa's "white boyfriend," Mark, whom they said had fathered Vanessa's unborn child. They were talking about killing Mark because he had been threatening Vanessa and her mother. Aguilar and Lopez were not asked to assist.

Aguilar heard defendants discuss a scheme of Vanessa calling Mark and asking him to pick her up; Vanessa persuading Mark to get out of his car; Ricardo taking his car; and then Denetric and Ricardo shooting Mark. Aguilar did not hear any discussion about stealing a car. Aguilar saw Denetric retrieve two guns, a revolver and a semi-automatic, and hand the semi-automatic to Ricardo. Lopez said he heard defendants discuss a plan to either "beat up" Mark or rob and carjack him.

At approximately 2:00 a.m., on May 26, 2007, Vanessa called Mark and asked him to pick her up. Vanessa told him she was stranded and needed a ride home. Mark agreed to pick her up. Ricardo drove Vanessa, Denetric, Aguilar, and Lopez to a warehouse. Ricardo, Denetric, Aguilar and Lopez all hid behind a cinder-block wall, waiting for Mark to arrive to pick up Vanessa. Ricardo and Denetric were each carrying a gun. Vanessa waited for Mark under a streetlight.

4

When Mark drove up to Vanessa, she approached the front passenger door, Denetric and Ricardo ran toward the car, shooting at Mark's car. Aguilar heard six to eight shots fired. Vanessa ran away and hide behind a tree. Aguilar and Lopez ran back to Ricardo's car. After the shooting, defendants also returned to Ricardo's car. Ricardo told the others he had not fired any shots because his gun had jammed. Denetric said he fired all his bullets.

Mark managed to drive away and call 911. He told the dispatcher he had been shot in the chest and desperately needed help. He said he did not know who shot him but believed his girlfriend set him up. He told the dispatcher he did not know where he was. He thought he was in San Bernardino and had driven into a ditch a half-mile from where he had been shot.

Deputy Joshua Cail was dispatched in response to Mark's call and found him pulled over in a remote area in Perris. There were gunshot holes in the windows and body panels of Mark's car. Mark told Cail what had happened and that two males, whom he did not know, shot him. He said his girlfriend was present during the shooting. Paramedics transported Mark to the hospital, where he died from a bullet wound to his chest. He had several gunshot wounds to his right side, chest, and leg.

Meanwhile, after the shooting, Ricardo drove back to Vanessa's apartment with Lopez, Aguilar, Vanessa and Denetric. Denetric dropped off the guns at the apartment, while the others waited in the car. Denetric returned to the car around 3:00 a.m. and defendants, Lopez, and Aguilar drove to a motel in Orange County, where they spent the night and remained for 10 to 12 hours. While at the motel, Vanessa called Mark's

5

mother, Nancy, and his sister, Cheryl Enoch, and told them various false stories about what had happened to her and Mark.

That afternoon, Ricardo left the motel with only Lopez and Aguilar, and dropped them off in Norwalk. Denetric and Vanessa also left. A few hours later, Vanessa and Denetric were arrested. Ricardo was arrested over a month later.

Vanessa told the 911 operator that Mark's family was claiming she killed him that night but she had not done anything, and she did not want the police to think she was trying to hide. Vanessa said she was worried about Mark because she had not been able to reach him by phone. Vanessa claimed she had been walking all night and was on a dirt road somewhere in Mead Valley.

During Vanessa's recorded statement to sheriff's detectives, she essentially repeated what she had told the 911 operator. She also said Mark was dangerous, she feared him, and he had threatened to take her baby from her when it was born.

Vanessa changed her story when Deputy Ryan Bodmer told her that Denetric and Vanessa's cell phones had provided tracking information on her location. Vanessa then told Bodmer three Mexican gang members came to her apartment while Denetric was there. The gang members said they wanted to rob Mark and scare him. They forced her to call Mark. She claimed she did not believe they were going to take his car or shoot him. Vanessa said she and Denetric were forced to accompany the gang members and Denetric was pushed into the car. After shooting at Mark's car, the gang members drove her to a hotel in Buena Park.

6

**Evidence Against Denetric**

Denetric stated during his recorded statement to sheriff's detectives that he was Vanessa's boyfriend and he had suspected that she was cheating on him. He believed Mark was the father of an earlier failed pregnancy. In addition, Mark had threatened Denetric, Vanessa, and their families. Denetric told three inconsistent versions of what had occurred during the night of the shooting. During his third and final version, Denetric said that everyone was upset at Mark for making threats. The group came up with a plan to have Vanessa meet Mark, and the others would take his car and beat him up. Vanessa was to lure Mark out of his car, while everyone else waited behind a wall. Denetric was told to use his gun on Mark. When Mark arrived, Ricardo ordered him out of his car but Mark drove off. One of Ricardo's friends, "Spooky," fired at Mark, emptying his revolver. Denetric and Ricardo's guns jammed. After the shooting, they returned to Vanessa's apartment so that they could retrieve their cell phones. They then all went to a hotel in Buena Park.

## III. ADMISSIBILITY OF EVIDENCE OF DENETRIC'S THREAT TO KILL MARK

Vanessa contends the trial court abused its discretion in allowing evidence that Denetric called Nancy and threatened to kill Mark and his family. Vanessa argues the evidence was inadmissible for three reasons: (1) It was irrelevant and unduly prejudicial under Evidence Code section 352; (2) it was inadmissible under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), because it constituted extrajudicial, incriminating statements by a non testifying codefendant; and (3) it constituted inadmissible hearsay.

7

*A. Factual and Procedural Background*

Nancy testified during trial that Denetric called her in January 2007. When the prosecutor asked Nancy how Denetric identified himself when he called, defense counsel objected on hearsay and *Aranda/Bruton* grounds. The trial court summarily overruled the objection. Nancy then testified that Denetric identified himself as Vanessa's boyfriend and told Nancy that Mark had better leave Vanessa alone, and if he did not, Denetric was going to kill him and his whole family. Denetric also threatened to blow up Mark's car. Denetric sounded serious and told Nancy Vanessa was pregnant with his child. He was shouting during the call.

*B. Relevancy and Undue Prejudice Grounds*

The People argue on appeal that Vanessa's objections to admissibility of evidence of Denetric's threat to kill Mark were forfeited because she did not assert the grounds in the trial court. Regardless of whether Vanessa forfeited the objection, it lacks merit because Nancy's testimony that Denetric threatened to kill Mark was highly probative regarding Vanessa's and her companions' motive and intent to kill Mark. We conclude the probative value of the evidence substantially outweighed any prejudicial impact it might have under Evidence Code section 352.

Under Evidence Code section 352, the trial court has discretion to exclude relevant evidence "'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' The trial court's exercise of discretion in admitting evidence under Evidence Code section 352 will not be

disturbed unless the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 406 (*Yovanov*).) The prejudice which exclusion of evidence under section 352 is designed to avoid is not the prejudice "to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).)

Vanessa argues evidence that Denetric threatened to kill Mark was irrelevant because Nancy and Denetric's phone conversation was not between coconspirators and there was no evidence Vanessa ever knew about the threat or that Mark's awareness of the threat affected their relationship. Vanessa argues that the People did not meet their burden of proving that, when Denetric threatened to kill Mark in January 2007, he and Vanessa had already conspired to commit the crime. Rather, the evidence showed that the conspiracy did not arise until the night of May 25, 2007. Also, the requisite overt acts for the conspiracy, of providing guns and ammunition, calling Mark, and hiding before ambushing him, did not occur until that night.

Although Denetric's threat to kill Mark may have been made several months before defendants conspired to kill Mark, the evidence was highly relevant to proving Denetric and Vanessa's intent and motive, as conspirators, to kill Mark. Although

9

Vanessa may not have ever been aware of the threat, there is substantial evidence that she conspired with Denetric and Ricardo to murder Mark, and the murder arose from her involvement with both Denetric and Mark, her infidelity, Denetric's jealousy because of Vanessa's involvement with Mark, and Vanessa's pregnancy and uncertainty as to who the father was. Because Vanessa was tried as a coconspirator and aider and abettor of Mark's murder, evidence of the coconspirators' motive and intent to kill, was relevant to show they conspired to murder Mark, and that it was foreseeable Denetric would shoot Mark. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1394, 1397 (*Spector*).) "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85.)

Citing *Spector, supra,* 194 Cal.App.4th 1335, Vanessa argues that the threat was too attenuated to be relevant. The threat was made to a third party (Nancy) in January 2007, four or five months before Mark was murdered in May 2007. In *Spector*, the court stated that statements of intent, reflecting on a defendant's state of mind, are "'admissible unless the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind was transitory and no longer existed at the time of the charged offense.' [Citation.]" (*Spector, supra,* 194 Cal.App.4th at p. 1395, quoting *Karis, supra,* 46 Cal.3d at p. 637.)

The court in *Spector* rejected the defendant's argument that evidence he had made generic threats to kill was inadmissible as too remote because the threats were made approximately 10 years before the charged murder. (*Spector, supra,* 194 Cal.App.4th at

10

p. 1397.)  The court in *Spector* stated:  "other evidence to be presented at trial would show a decades-long 'history of acts that indicate . . . violence toward women,' and therefore this threat was part of a 'continuing pattern.'  We agree this long history tends to demonstrate the sincerity with which Spector uttered these words, and the fact that his 'state of mind was [not] transitory and [still] existed at the time of the charged offense.' [Citation.]"  (*Spector, supra,* 194 Cal.App.4th at p. 1397.)

Here, there was not a long history of defendants making threats against Mark. Nevertheless, the trial court did not abuse its discretion in allowing the evidence because Denetric's threat was not too attenuated; the threat was sincere and demonstrated a preexisting intent and motive by one of the coconspirators to kill Mark, under the same motivating conditions that continued to exist up until the time of the murder.  The threat was not generic.  It was specifically against Mark, the victim of the charged offense, and involved Vanessa, a coconspirator.  Furthermore, the threat was made within five months before the murder, while Vanessa was still pregnant and had remained in contact with Mark.  Under such circumstances, the trial court did not abuse its discretion in allowing Nancy's testimony regarding Denetric's threat to kill Mark.  The trial court reasonably found that the highly probative nature of the evidence substantially outweighed the danger of undue prejudice from its admission.  (§ 352; *Yovanov, supra,* 69 Cal.App.4th at p. 406; *Karis, supra,* 46 Cal.3d at p. 637.)

C.  *Aranda/Bruton Challenge*

Vanessa contends that Nancy's testimony that Denetric threatened to kill Mark violated her rights to be protected from a nontestifying codefendant's incriminatory

11

statements under *Aranda, supra,* 63 Cal.2d 518 and *Bruton, supra,* 391 U.S. 123.

Vanessa acknowledges that if a statement is not testimonial, the Sixth Amendment

Confrontation Clause is inapplicable, but argues that *Bruton* applies, not only to custodial

confessions, but also to inadmissible hearsay statements by nontestifying codefendants

made to family or friends. Vanessa argues that allowing the evidence constituted

*Aranda/Bruton* error in violation of her Fourteenth Amendment right to due process.

Furthermore, even if there was no federal right violation, the evidence violated state

statutory protections (§ 1098) under *Aranda*.

Under the Sixth Amendment's Confrontation Clause, "'[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The

confrontation clause bars admission of "testimonial" hearsay unless the declarant is

unavailable to testify and the defendant had a prior opportunity to cross-examine the

declarant. (*Id.* at pp. 53-54, 68.) "If the statement is not testimonial, it does not implicate

the confrontation clause, and the issue is simply whether the statement is admissible

under state law as an exception to the hearsay rule." (*People v. Garcia* (2008) 168

Cal.App.4th 261, 291.) Although the *Crawford* court did not define testimonial

statements, it listed as examples among other things, "'extrajudicial statements . . .

contained in formalized testimonial materials, such as affidavits, depositions, prior

testimony, or confessions,' [citation]; [and] 'statements that were made under

circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial.'" (*Crawford, supra*, 541 U.S. at pp. 51-52.)

It is undisputed Denetric was an unavailable witness and his statements to Nancy during the telephone conversation were not testimonial under *Crawford, supra,* 541 U.S. at pages 51-52, 68. Furthermore, the statements did not implicate Vanessa, directly or indirectly, other than by later providing at trial circumstantial evidence of Vanessa's motive to conspire in killing Mark. A nontestifying codefendant's hearsay statement is inadmissible only if it is "incriminating on its face"; it is admissible if it becomes incriminating "only when linked with evidence introduced later at trial . . . ." (*Richardson v. Marsh* (1987) 481 U.S. 200, 208.) Therefore the *Bruton* rule does not apply here because it is premised on the Confrontation Clause. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)

Vanessa alternatively argues that, even if *Bruton, supra,* 391 U.S. 123 is inapplicable, admission of the evidence violated her due process rights under state law; specifically, *Aranda, supra,* 63 Cal.2d 518 and section 1098. Vanessa asserts Nancy's testimony regarding Denetric's threat violated her federal due process rights under the Fifth Amendment, applicable through the Fourteenth Amendment. *Aranda* is not based on the Sixth Amendment because, when *Aranda* was decided, the Confrontation Clause had not yet been interpreted to prohibit admission of a nontestifying codefendant's 'extrajudicial statement. The court in *Aranda* stated that its holding was "to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement section 1098." (*Aranda, supra,* 63 Cal.2d at p. 530.)

13

But if federal constitutional law does not require exclusion of the evidence, the evidence cannot be excluded under *Aranda* either: "To the extent that our decision in *People v. Aranda, supra*, 63 Cal.2d 518, constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)).[] [Citations.]" (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

Proposition 8 provides an exception to exclusion of hearsay evidence under an existing hearsay statute: "Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay . . . ." (Cal. Const., art. I, § 28, subd. (f)(2)). Section 1098 plainly is not a rule of evidence. (Cal. Const., art. I, § 28, subd. (f)(2).) Section 1098 is found in the Penal Code, not the Evidence Code. It contains no provision governing the admission or exclusion of evidence. Because section 1098 is not a rule of evidence, we conclude the hearsay exception to Proposition 8's rule of abrogation does not apply, and *Aranda* does not require the exclusion of Nancy's testimony that Denetric threatened to kill Mark.

Since Denetric's threat was hearsay – "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)), it was inadmissible unless it fell within a hearsay exception. As discussed below, we conclude the testimony did not constitute inadmissible hearsay.

14

*D. State of Mind Hearsay Exception*

Vanessa contends Nancy's testimony that Denetric threatened to kill Mark constituted inadmissible hearsay and therefore the trial court erred in overruling her hearsay objection. The People argue the hearsay testimony was admissible under the state-of-mind hearsay exception. (Evid. Code, § 1250.) We agree.

Evidence Code section 1250, commonly referred to as the state-of-mind hearsay exception, provides, in relevant part, that, a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when offered (1) to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action, or (2) to prove or explain acts or conduct of the declarant. (Evid. Code, § 1250, subd. (a)(1), (2).)

Under the state-of-mind hearsay exception, a statement of one's state of mind is one that (1) reflects the declarant's mental state, and (2) is offered, among other purposes, to prove the declarant's conduct, including the declarant's future conduct in accordance with his or her expressed intent, unless the statement was made under circumstances indicating lack of trustworthiness. (Evid. Code, § 1252; *People v. Griffin* (2004) 33 Cal.4th 536, 578.) The elements essential to admissibility are that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; and it must be relevant to an issue in the case. (*People v. Majors* (1998) 18 Cal.4th 385, 404, quoting *People v. Alcalde* (1944) 24 Cal.2d 177, 187.)

15

Here, Nancy's hearsay testimony fell within the state-of-mind exception. The testimony reflected the declarant's mental state, including Denetric's intent and motive for killing Mark. Nancy's testimony that Denetric threatened to kill Mark and his family, reflected Denetric's mental state that he was angry at Mark and intended to kill him if Mark contacted Vanessa or had anything to do with her, because Vanessa was Denetric's girlfriend and was carrying Denetric's baby. The testimony was relevant to establishing Denetric's criminal conduct of killing Mark, which was consistent with his expressed intent when he told Nancy he would kill Mark if Mark did not leave Vanessa alone.

Denetric's hearsay statement was also made under circumstances indicating trustworthiness. Denetric told Nancy his name and claimed Vanessa was his girlfriend. Nancy testified his tone of voice was serious and she was concerned about his threat but did not report it to the police out of fear doing so would make matters worse. The hearsay statement arose under circumstances that supported a finding of trustworthiness. There was thus no abuse of discretion in the trial court allowing Nancy's hearsay testimony regarding Denetric's threat to kill Mark.

Vanessa argues the state-of-mind exception was inapplicable as to admission of the hearsay evidence before the jury, because the hearsay did not reflect her then-existing state of mind and was irrelevant. But under Evidence Code section 1250, the exception applied if the statement reflected the declarant's state of mind. Denetric was the declarant, not Vanessa. Also, as already discussed, Denetric's threat to kill Mark was relevant to the charges against Vanessa, because the evidence showed the motive for

16

Mark's murder and Vanessa was charged with aiding and abetting, and conspiring with Denetric in committing the murder.

IV

CALCRIM NO. 540B

Vanessa and Denetric argue the trial court erred in modifying the felony murder instruction, CALCRIM No. 540B, by failing to instruct the jury sua sponte on the requisite element of causation. Denetric argues the court erred in omitting paragraph 4 of CALCRIM No. 540B instruction, which states that a felony murder conviction requires a finding that the perpetrator caused the death of another person while committing the underlying felonies. Vanessa argues the court also erred in omitting paragraph 5 of CALCRIM No. 540B, which instructs that a felony-murder conviction by a non-killer requires a finding that there was a logical connection between the cause of death and the predicate felonies, which is more than just their occurrence at the same time and place (CALCRIM No. 540B, par. 5).[3]

---

[3] The paragraphs omitted from the standard CALCRIM No. 540B instruction, state the following:

"4. While committing [or attempting to commit], _____ *<insert felony or felonies from Pen. Code, § 189>* the perpetrator caused the death of another person(;/.)

*<Give element 5 if the court concludes it must instruct on causal relationship between felony and death; see Bench Notes.>*

[AND

5. There was a logical connection between the cause of death and the _____ *<insert felony or felonies from Pen. Code, § 189>* [or attempted _____ *<insert felony or felonies from Pen. Code, § 189>*]. The connection between the cause of death and the _____ *<insert felony or felonies from Pen. Code, § 189>* [or attempted _____ *<insert felony or felonies from Pen. Code, § 189>*] must involve more than just their occurrence at the same time and place.]" (CALCRIM No. 540B.)

17

During a discussion of the jury instructions, the trial court announced, without elaborating, that it would give CALCRIM No. 540B, relating to coparticipants committing murder. The text of the standard CALCRIM No. 540B instruction directs the trial court to give element 5 (paragraph 5) "if the court concludes it must instruct on causal relationship between felony and death; see Bench Notes." (CALCRIM No. 540B.)

The Bench Notes to CALCRIM No. 540B state in relevant part: "Bracketed element 5 is based on *People v. Cavitt* (2004) 33 Cal.4th 187, 193 [*Cavitt*]. In *Cavitt*, the Supreme Court clarified the liability of a nonkiller under the felony-murder rule when a cofelon commits a killing. The court held that 'the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act causing the death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit. The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction.' (*Ibid.* [italics in original].) . . . ***Give bracketed element 5 if the evidence raises an issue over the causal connection between the felony and the killing.*** In addition, the court may give this bracketed element at its discretion in any case in which this instruction is given. ***If the prosecution alleges that the defendant did not commit the felony but aided and abetted or conspired to commit the felony, the committee recommends giving bracketed element 5***." (CALCRIM No. 540B; bold italics added.)

18

Vanessa's jury instruction challenge is premised on the trial court's inexplicable omission of paragraph 5, which requires the jury to find a logical connection between the cause of death and the underlying felony. The evidence shows that Vanessa did not commit the underlying felonies of robbery and carjacking, but aided and abetted or conspired to commit the crimes. Vanessa argues there was evidence raising an issue as to the causal connection between the predicate felony crimes (robbery and carjacking) and the killing, since she claimed she did not know Denetric intended to shoot Mark when defendants carried out the robbery and carjacking.

## A. Forfeiture

The People argue Vanessa and Denetric forfeited their jury instruction challenges because they did not object in the trial court to the trial court omitting paragraphs 4 and 5 from CALCRIM No. 540B. We agree. As stated in the Bench Notes for CALCRIM No. 540B, the majority in *Cavitt, supra,* 33 Cal.4th at pages 203-204, "concluded that the court has no sua sponte duty to instruct on the necessary causal connection." (CALCRIM No. 540B.) The *Cavitt* court explained: "We further find that the trial court had no sua sponte duty to clarify the logical-nexus requirement. The existence of a logical nexus between the felony and the murder in the felony-murder context, like the relationship between the robbery and the murder in the context of the felony-murder special circumstance [citation], *is not a separate element of the charged crime but, rather, a clarification of the scope of an element.* [Citation.] '[T]he mere act of "clarifying" the scope of an element of a crime or a special circumstance does not create a new and

19

separate element of that crime or special circumstance.' [Citation.]" (*Cavitt, supra,* 33 Cal.4th at pp. 203-204; italics added.)

The *Cavitt* court therefore concluded: "In sum, there is no sua sponte duty to clarify the principles of the requisite relationship between the felony and the homicide without regard to whether the evidence supports such an instruction. [Citation.] [¶] Because the evidence here did not raise an issue as to the existence of a logical nexus between the burglary-robbery and the homicide, the trial court had no sua sponte duty to clarify this requirement. This is not a situation in which Mianta just happened to have shot and killed her lifelong enemy, . . . Betty, the murder victim, was the intended target of the burglary-robbery." (*Cavitt, supra,* 33 Cal.4th at p. 204.)

Likewise, here, the trial court did not have a sua sponte duty to clarify the felony-murder causation element by giving paragraphs 4 and 5, since the evidence established Mark was the intended target of the felonies and homicide, and the crimes occurred during a single, continuous transaction. By not requesting CALCRIM No. 540B, paragraphs 4 and 5, Vanessa and Denetric forfeited their objections to the trial court omitting these paragraphs clarifying causation.

B. *Harmless Error*

Even assuming the trial court should have included paragraphs 4 and 5, when giving CALCRIM No. 540B on felony murder, any error was harmless. In the instant case there was substantial evidence that Mark was the target of the underlying felonies of robbery and carjacking, and was shot during their commission or attempted commission. Mark was in his car when Vanessa approached him, and Denetric and Ricardo ran toward

20

the car, shooting at Mark. Evidence of these circumstances supported a finding that the killing occurred during the commission or attempted commission of the predicate felonies.

The omission of paragraphs 4 and 5 was also harmless because the trial court instructed the jury that "It is not required that the person die immediately, *as long as the cause of death and the* (*felony/felonies*) *are part of one continuous transaction*." (CALCRIM No. 540B; italics added.) As applied to the facts in the instant case, this instruction required the jury to find both a temporal relationship and causal nexus between the shooting and underlying felonies. The causal nexus and temporal relationship were inherent in a finding that the shooting and the felonies were part of one continuous transaction. It was therefore not probable that the jury would have found there was no causal nexus and temporal relationship, had the trial court included paragraph 5 of CALCRIM No. 540B, requiring a logical connection between the cause of death and felonies. As the court noted in *Cavitt*, "cases that raise a genuine issue as to the existence of a logical nexus between the felony and the homicide 'are few indeed.' It is difficult to imagine how such an issue could ever arise when the target of the felony was intentionally murdered by one of the perpetrators of the felony." (*Cavitt, supra,* 33 Cal.4th at p. 204, fn. 5.)

On the record, there is little if any evidence that the homicide was completely unrelated to the robbery-carjacking. (*Cavitt, supra,* 33 Cal.4th at p. 204.) Therefore, omission of paragraphs 4 and 5 of CALCRIM No. 540B was harmless error, since it is not reasonably probable that the outcome would have been more favorable to Vanessa

21

and Denetric had paragraphs 4 and 5 of CALCRIM No. 540B been given. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Because there was no prejudicial error, we also reject Vanessa's ineffective assistance of counsel challenge. Her attorney's failure to request an amplifying instruction on the need for a finding of logical nexus between the felonies and homicide was not prejudicial error, since it is not reasonably probable that but for her attorney's omission, the outcome would have been more favorable to Vanessa. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

V

CALCRIM No. 521

Vanessa contends the trial court failed to instruct the jury properly on second degree murder because, when the court gave CALCRIM No. 521 on first degree murder, the court omitted from the instruction the maxim that "all other murders are of the second degree." (CALCRIM No. 721, 2009-2010 version.) This language was included in the standard 2009-2010 version of CALCRIM No. 521, but was eliminated from the 2011 version of CALCRIM No. 521. (See CALCRIM No. 521 (2009–2010 ed.) p. 271; CALCRIM No. 521 (2011 ed.) p. 271.)

When CALCRIM No. 521 was revised in 2011, the following language was added: "[The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.]" (CALCRIM No. 521 (2011 ed.) p. 271.) The 2011 version of CALCRIM No. 520, also states that, if there is substantial evidence of first degree

22

murder, the court shall instruct the jury as follows: "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

Defendant's trial took place in 2011. The trial court used the 2011 version of the CALCRIM jury instructions, Nos. 520 and 521, but did not include language in either CALCRIM No. 520 or CALCRIM No. 521 that all murders are second degree, unless found to be first degree.

Vanessa argues that the omitted language left the jury without any guidance on how to reach a second degree murder conviction. We disagree. The trial court instructed the jury on the general elements of second degree murder. CALCRIM No. 520, as given to the jury, stated that to prove defendant is guilty of murder, "the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought." The instruction also included definitions of express and implied malice. In addition, CALCRIM No. 521, as read to the jury, stated that "The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, First or Second Degree Murder With Malice Aforethought."

The trial court's omission of language that all murders are second degree, unless found to be first degree, does not constitute failure to instruct on an element of second degree murder. Therefore, because Vanessa failed to object in the trial court to the omission, or request further clarification or amplification, Vanessa forfeited her objection in this court. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) "A trial court has no sua

23

sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*Ibid.*) The trial court accurately instructed the jury on the elements of second degree murder. Although the court should have included the language clarifying that murders are second degree, unless found to be first degree, Vanessa was obliged to request it in the trial court. (*Ibid.*)[4]

## VI

## INSTRUCTION ON LYING IN WAIT

Ricardo and Denetric contend the trial court improperly modified CALCRIM No. 548 by instructing the jury that lying in wait was a separate, independent theory of murder. The trial court gave the jury the following modified version of CALCRIM No. 548 on murder:

"The defendant has been prosecuted for murder under three theories: (1) malice aforethought and (2) *lying in wait* and (3) felony murder.

"Each theory of murder has different requirements and I will instruct you on each.

"You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory." (Italics show language added to the standard instruction.)

---

[4] We reject Denetric's joinder in Vanessa's objection regarding CALCRIM No. 521 on the same grounds.

Ricardo and Denetric argue that the trial court improperly added to CALCRIM No. 548, lying in wait as a murder theory. They argue this modification permitted the jury improperly to convict Ricardo and Denetric of murder based on lying in wait, without finding any intent to kill. Ricardo and Denetric's defense was that they planned only to beat up or assault Mark, not to rob, carjack, or kill him. Ricardo acknowledges on appeal that "the defense at all points conceded that Ricardo lied in wait with the intent to assault Mr. Enoch." Ricardo and Denetric argue there was substantial evidence that Mark's death was unintentional. Therefore, because the jury was not instructed murder based on lying in wait required malice aforethought, the improperly modified murder instruction, CALCRIM No. 548, undercut the presumption of innocence and their defense, improperly lightened the prosecution's burden of proof, and violated their right to effective assistance of counsel by converting defendants' assault defense into a concession of guilt.

The trial court was required to give CALCRIM No. 548 on murder, since murder was charged on theories of malice and felony murder. But even assuming the trial court improperly modified the instruction by adding lying in wait as a third murder theory, this modification does not constitute prejudicial error because the instructions as a whole adequately informed the jury that a murder conviction based on lying in wait required a finding of malice aforethought.

The trial court instructed the jury according to CALCRIM Nos. 520 and 521, on murder and first degree murder. CALCRIM No. 520 told the jury, in pertinent part, that to prove defendant was guilty of murder, "the People must prove that: [¶] 1. The

25

defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he or she had a state of mind called malice aforethought." The instruction also included definitions of express and implied malice. CALCRIM No. 521 instructed the jury on first degree murder. The instruction stated that defendants were prosecuted for first degree under the theories of (1) willful, deliberate, and premeditated murder, (2) lying-in-wait murder, and (3) felony murder.

Based on these instructions, it is not reasonably probable that the jury would have construed CALCRIM No. 548 as allowing a finding of murder based on lying in wait, in the absence of a finding of either express or implied malice aforethought. We do not believe there is "a reasonable likelihood" the jury understood the instructions as defendants assert or that the modified instruction undercut the presumption of innocence and lightened the prosecution's burden of proof. In making this determination, we have considered the specific language challenged, the instructions as a whole, and the jury's findings. (*People v. Cain* (1995) 10 Cal.4th 1, 36.)

Furthermore, any error in modifying CALCRIM No. 548 by adding lying in wait as a murder theory, was harmless under any standard (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Watson, supra,* 46 Cal.2d at p. 836), because the jury found true the lying-in-wait special circumstance as to both Ricardo and Denetric. The trial court instructed the jury that the lying-in-wait special circumstance required a finding of an intent to kill. (CALCRIM Nos. 703, 728.) The trial court gave CALCRIM No. 728, which, as read to the jury, stated the following: "The defendant is charged with the special circumstance of murder committed by means of lying in wait. [¶] To prove this

26

special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Mark Enoch; and [¶] 2. The defendant committed the murder by means of lying in wait." The court further described the requisite elements of lying in wait and explained that "Lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind . . . equivalent to premeditation deliberation. [¶] The defendant acted deliberately if he or she carefully weighed considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he or she decided to kill before committing the act that caused death."

These instructions given to the jury on the lying-in-wait special circumstance required the jury to find intent to kill. Since the jury found true the lying-in-wait special circumstance, it is highly probable that the outcome would have been the same and the jury would have found Ricardo and Denetric guilty of first degree murder by lying in wait, even if the trial court had not modified CALCRIM No. 548 to include lying in wait as an independent murder theory.

For these same reasons, we reject Ricardo's related contention that CALCRIM No. 548, as modified by the court, violated his Sixth Amendment right to effective assistance of counsel. Ricardo argues that the instruction undercut his defense by improperly adding lying in wait as a murder theory. Ricardo conceded in his opening statement at trial and during closing argument that he was complicit in assaulting Mark but claimed he acted without any intent to kill him, and therefore was not guilty of murder. Ricardo argues that, because the trial court unexpectedly modified CALCRIM

27

No. 548 by adding lying in wait as a murder theory, without requiring malice aforethought, his attorney was unable effectively to present Ricardo's defense. Ricardo did not anticipate that conceding to lying in wait and assault would result in a murder conviction based on lying in wait, without any finding of malice aforethought.

We recognize "[a] criminal defendant is entitled to assistance of counsel at all critical stages of the proceeding. [Citations.] 'The right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitive of our constitutional rights. [Citations.]'" (*People v. Lara* (2001) 86 Cal.App.4th 139, 149-150.) Here, Ricardo is not arguing his attorney's representation was deficient. Rather, he is arguing that the trial court deprived him of effective assistance of counsel because the court gave modified CALCRIM No. 548, which interfered with Ricardo's attorney's assistance in effectively defending Ricardo. Normally, prejudice is presumed when the state interferes with counsel's assistance. (*Strickland v. Washington, supra,* 466 U.S. at pp. 691-692.)

Even assuming the trial court erred in modifying CALCRIM No. 548 by adding lying in wait as a murder theory, this did not deprive Ricardo of his Sixth Amendment right to counsel or to effective representation. Ricardo received effective representation throughout the trial and the jury instructions, as a whole, adequately instructed the jury that a murder conviction required a finding of malice aforethought. We cannot say that CALCRIM No. 548, as modified, deprived Ricardo of his Sixth Amendment right to effective assistance of counsel.

28

# VII

## ATTEMPT AND CONSPIRACY INSTRUCTION

Ricardo contends the trial court erred in failing to instruct the jury on attempt and conspiracy, regarding felony murder. Ricardo argues this violated his right to instruction on all elements of felony murder and fundamentally undermined his defense that he was not complicit in the murder, robbery, or carjacking. He only planned to aid an assault on Mark. Therefore he was not liable for felony murder.

The trial court instructed the jury on first degree felony murder by giving modified CALCRIM No. 540B. The jury was instructed that it could convict Ricardo of first degree felony murder upon finding Mark was killed during an attempted robbery or carjacking. The court further instructed the jury that, in deciding whether Ricardo and the perpetrator (Denetric) committed or attempted to commit robbery or carjacking, the jury should refer to the separate instructions given on robbery, carjacking, aiding and abetting, and conspiracy.

Ricardo argues the trial court committed reversible error by not giving CALCRIM No. 460 defining an attempt and not properly instructing on conspiracy. Neither party requested CALCRIM No. 460 and only the People requested CALCRIM No. 416 (uncharged conspiracy). The court gave CALCRIM No. 416, along with CALCRIM No. 417 (liability for coconspirators' acts) and CALCRIM No. 418 (coconspirator's statements). Recognizing in his appellate reply brief that these conspiracy instructions were given, Ricardo has withdrawn his contention the jury was not properly instructed on conspiracy.

29

Although, as conceded by the People, the court erred in not giving CALCRIM No. 460, describing the requirements of an attempt. We conclude the error was harmless beyond a reasonable doubt because it is not reasonably likely the omission could have affected the jury's verdict. (*People v. Williams* (2009) 170 Cal.App.4th 587, 627.) "[T]he factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, . . ." (*People v. Sedeno* (1974) 10 Cal.3d 703, 721 (*Sedeno*).)

Here, the jury found Ricardo guilty of first degree murder (§ 187, subd. (a)), guilty of the firearm personal use enhancement (§§ 12022.53, subd. (b), 1192.7, subd. (c)(8)), guilty of the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), and not guilty of the robbery special circumstance. Ricardo's first degree murder conviction and the jury's rejection of the robbery special circumstance demonstrate that the jury did not rely on felony murder as the basis for Ricardo's conviction and rejected the theory that he committed or attempted to commit the underlying predicate offense of robbery.

The instruction on the felony murder special circumstance was similar to the instruction given on first degree felony murder based on robbery and carjacking, with the exception the special circumstance instruction contained the additional requirement that Ricardo was "a major participant" and "acted with reckless indifference to human life." There was overwhelming evidence establishing these two additional facts. Ricardo brandished a semi-automatic gun during the murder, as he and Denetric ran toward

30

Mark's car, with Denetric firing his revolver at Mark multiple times. There was evidence Mark's gun jammed while he attempted to fire at Mark. Under these circumstances, which reflect that the jury did not rely on the felony murder theory, but rather convicted Ricardo of first degree murder based on lying in wait, the failure to instruct on the elements of attempt, as applied to felony murder, was harmless error.

Likewise, omission of instruction on the elements of attempt was not prejudicial to Denetric, who joins in Ricardo's contentions on appeal. Unlike as to Ricardo, the jury trying Denetric, found true the felony murder special circumstance. However, the jury also found true the lying-in-wait special circumstance and there was overwhelming evidence that Denetric committed first degree murder by lying in wait. We conclude, based on the totality of the evidence and instructions given to the jury, that any error in not instructing on the elements of attempt was harmless error as to both Ricardo and Denetric.

VIII

MANSLAUGHTER INSTRUCTION

Ricardo contends the trial court erred in failing to instruct on manslaughter as a lesser included offense to murder under the natural and probable consequence doctrine. He argues the court was required to give the instruction because there was ample evidence from which the jury could have found Ricardo had agreed to aid only the predicate offense of assault.

In a criminal trial, "'the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]' . . . That obligation has been

31

held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*Sedeno, supra,* 10 Cal.3d at pp. 715-716, overruled on other points in *People v. Breverman* (1998) 19 Cal.4th 142, 163, fn. 10 & *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12.)  The duty to instruct as to lesser included offenses exists only when there is substantial evidence to support the instruction on the lesser offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)  Substantial evidence in this context is not any evidence, no matter how weak, but rather evidence from which a jury composed of reasonable persons could conclude that the lesser offense, but not the greater, was committed.  (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

Here, Ricardo argues the trial court should have instructed the jury that, if he initially contemplated only assaulting Mark, the jury could decide whether any lesser included offense to murder, such as manslaughter, was reasonably foreseeable.  Ricardo argues there was substantial evidence establishing manslaughter as a lesser included offense of murder, since the evidence only showed that he intended to beat up Mark and did not intend to kill him.  Therefore there was sufficient evidence to support a manslaughter as a natural and probable consequence to assault, and the trial court should have instructed the jury accordingly.

We conclude the trial court did not commit reversible error by not sua sponte instructing the jury on manslaughter as a lesser included offense to murder under the natural and probable consequence doctrine.  The instructions as a whole were sufficient.

32

The court instructed the jury on (1) the general principles of aiding and abetting (CALCRIM No. 400), (2) aiding and abetting an intended crime (CALCRIM No. 401), (3) voluntary manslaughter as a lesser offense of murder (modified CALCRIM No. 570), and (4) lesser offenses, generally (CALCRIM No. 3517).

Modified CALCRIM No. 570, as read to the jury, stated: "An unintentional killing, without malice, committed during the commission of an inherently dangerous felony, such as shooting into an occupied motor vehicle, 246 PC, is at least a voluntary manslaughter. [¶] If you find that the defendant did not harbor implied malice at the time of the killing because he or she did not subjectively appreciate that the conduct endangered the victim's life, the crime committed is voluntary manslaughter."

CALCRIM No. 3517, as read to the jury, stated in relevant part: "There is a lesser offense under Count 1. The lesser is voluntary manslaughter. If you find the defendant guilty of the lesser, it may change which special allegations you need to consider. As you consider Count 1 and the lesser, you may consider them in any order you wish. However, before the Court can accept a verdict of guilty on the lesser crime, the jury must have found the defendant not guilty of the greater crime."

Under the facts in the instant case, the trial court adequately instructed the jury on voluntary manslaughter as a lesser offense to murder. There was no sua sponte duty to instruct on assault because it was not relied on by the prosecution as a potential target offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 268-269.) With regard to instruction on involuntary manslaughter as a lesser offense to murder, there was not substantial evidence of involuntary manslaughter, since the evidence established that

33

Denetric and Ricardo both intentionally fired their guns at Mark's car. Denetric, who succeeded in fatally shooting Mark, fired multiple times at Mark, after hiding behind a wall and ambushing him.

In addition, any instructional error in omitting instruction on the lesser included offense of manslaughter was harmless error under any standard. (*Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.) The trial court instructed the jury on voluntary manslaughter as a lesser offense, and jury rejected the theory, finding that Ricardo was guilty of first degree murder, with a special circumstance finding of murder by lying in wait.

IX

SHACKLES

Ricardo contends the trial court violated his state and federal constitutional rights to counsel and due process by restraining him with shackles during trial, without any showing of manifest need or consideration of less restrictive alternatives. To the extent Denetric joins in this contention, he forfeited the issue by not objecting in the trial court to being shackled. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583.)

A. *Background Facts*

During in limine proceedings, the trial court raised the issue of courtroom security and asked counsel whether defendants should wear chains, cuffs or leg braces, and whether a deputy should stand next to them. The court noted that it was required to make particularized findings if such security measures were taken. The prosecutor said that there was a risk to the jury if defendants, who were charged with murder, were not

34

accompanied by a deputy. Nevertheless, the prosecutor further stated: "I can't make any particularized claims that these defendants are dangerous. I don't believe that they've been violent in the jail. So my guess is that they will follow the Court's orders and not be violent if they choose to testify. [¶] So my position, I guess, is that if the Court feels comfortable with them testifying up there with no one next to them, I don't have a problem with it." The prosecutor added: "I think [defendants] could be a risk to jurors if the defendants decided at that moment to act out, and that's my concern."

Ricardo's attorney objected to imposing security measures because they were highly prejudicial and would convey to the jury that he was a dangerous person. Ricardo's attorney stated that such measures were inappropriate since Ricardo did not have any history of violence in jail and had been cooperative during the entire time he was incarcerated (four years).

The trial court noted that the courtroom setup warranted additional security because the bench, jury box, witness stand, court reporter, and the door leading to a secure hallway, where judges and staff had their offices and chambers, were all within close proximity of where defendants were located. The court added that the case was a serious case, in which the potential penalty was life without the possibility of parole. Since the court had not yet heard from the jail authorities regarding defendants' behavior in jail, the court tentatively ordered a deputy to stand by the door to the secure hallway. The court also required a deputy to stand by defendants if they testified. The court tentatively ordered that defendants wear leg braces, which were not visible.

35

After taking a recess and receiving information from the jail regarding defendants, a deputy reported that Vanessa had been in a fight in jail, in 2008, and had some mental health issues; razors were found in Denetric's Bible in his jail cell; and pruno[5] was found in Denetric and Ricardo's cells. In addition, Denetric had mental health issues and had attempted suicide. Ricardo also had a couple of insignificant jail violations. Based on this information, and since defendants were charged with the very serious crime of murder, the trial court ordered that defendants were to wear concealed leg braces, which prevented defendants from walking quickly.

*B. Applicable Law*

"Due process prohibits shackling noticeable by a jury unless, in the sound exercise of the trial court's discretion, case-specific concerns like 'special security needs or escape risks' pose a threat to an essential state interest so as to show 'adequate justification' for the shackling. [Citations.] If the requisite showing is not in the record, a trial court ordering such shackling commits an abuse of discretion, a 'defendant need not demonstrate actual prejudice to make out a due process violation,' and the error is reversible unless the prosecution proves beyond a reasonable doubt that the error did not contribute to the verdict. [Citations.]" (*People v. Soukomlane* (2008) 162 Cal.App.4th 214, 229 (*Soukomlane*), quoting *Deck v. Missouri* (2005) 544 U.S. 622, 633, 635.)

Similarly, California law provides that "'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there

---

[5] Pruno is prison alcohol surreptitiously made from prison food.

is a showing of a manifest need for such restraints.' [Citation.] Second, 'in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances,' and a trial court should exercise discretion to use less drastic and less noticeable restraints when 'safe to do so.' [Citation.]" (*Soukomlane, supra,* 162 Cal.App.4th at pp. 229-230, citing *People v. Duran* (1976) 16 Cal.3d 282, 290-291.)

"'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' [Citation.] Moreover, '[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' [Citation.]" (*People v. Cox* (1991) 53 Cal.3d 618, 651 (*Cox*).) We review a trial court's decision to shackle a defendant for abuse of discretion. However, that discretion is "relatively narrow." (*Ibid.*)

*C. Analysis*

Here, the court considered and stated on the record its basis for finding a manifest need for security restraints. The only basis for using security restraints on Ricardo was that pruno was found in his cell and he had a couple insignificant jail violations. He did not have any history of violence and throughout four years of court proceedings, he had been cooperative and had not acted out. As Ricardo points out, there was no evidence that he was likely to be unruly, to try to escape, or to engage in disruptive nonconforming

37

conduct. The leg restraints as to Ricardo were thus inappropriate and an abuse of discretion, since the requisite showing of an "adequate justification" or a "manifest need" was absent. (*Soukomlane, supra,* 162 Cal.App.4th at p. 230.)

The trial court ordered defendants shackled based in part on the fact defendants were charged with murder, a serious and violent felony. (See §§ 667.5, subd. (c)(8), 1192.7, subd. (c)(8).) But even a defendant accused of a capital crime, however, cannot be shackled for that reason alone. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944; *People v. Seaton* (2001) 26 Cal.4th 598, 652.) The trial court also found a manifest need for shackles based on the layout of the courtroom. However, this also does not constitute a valid basis for ordering shackles. (*Seaton,* at p. 652.)

Nevertheless, error in ordering Ricardo to wear shackles during trial was harmless. "[W]e have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596 [error clearly harmless because defendant did not testify, no indication on the record that he would have but for his restraint, and no evidence jurors were aware of the restraint; see also *People v. Wallace* (2008) 44 Cal.4th 1032, 1051; *Cox, supra,* 53 Cal.3d at p. 652; *People v. Jackson* (1993) 14 Cal.App.4th 1818, 1828 [Fourth Dist., Div. Two].) Assuming an abuse of discretion, a defendant can suffer no possible prejudice where there is no indication on the record that the jurors knew he was restrained, that he suffered any deleterious effects from the restraint, or that the restraint influenced his decision to testify. (*Wallace,* at p. 1051.)

Here, the record reflects that the court ordered the restraints concealed and there is no evidence that they were observed by the jurors, that Ricardo suffered any deleterious effect from the restraint, or that the restraint influenced his decision to testify. Ricardo was shackled using a concealed leg brace worn underneath his pant leg. Therefore shackling Ricardo during his trial was not prejudicial error.

X

FLIGHT INSTRUCTION

Ricardo argues the jury instruction on flight violated due process because it was one-sided. Evidence was presented at trial that immediately after the shooting, defendants traveled to Buena Park and spent the night at a motel. Based on this evidence, the trial court gave CALCRIM No. 372 on flight. The instruction told the jury it could rely on evidence of flight to convict Ricardo but there was no instruction that the jury could also rely on evidence of an absence of flight to acquit him. Defendants did not object to the instruction or request any modification or change.

Ricardo argues the flight instruction was one-sided because there was also evidence of an absence of flight by Ricardo. Unlike Vanessa and Denetric, Ricardo was not arrested right after the shooting. He was arrested over a month later. Rather than fleeing after Vanessa and Denetric were arrested, Ricardo continued his normal way of life and was ultimately arrested while visiting someone in county jail. Ricardo contends the flight instruction was not balanced because it did not tell the jury that, if the jury found he did not flee, the jury could consider such evidence as showing he was not guilty. The instruction singled out a certain type of evidence (fleeing) and told the jury it could

39

rely on it to convict, without also telling the jury it could acquit based on the absence of this same type of evidence.

There was no error in not instructing sua sponte on the absence of evidence of flight. Our high court in *People v. Staten* (2000) 24 Cal.4th 434, 459 rejected this argument, holding that there is no reciprocal duty to instruct on the absence of flight, even on request. The *Staten* court explained that in *People v. Green* (1980) 27 Cal.3d 1, 39 and 40 (*Green*), the California Supreme Court "held that refusal of an instruction on absence of flight was proper and was not unfair in light of Penal Code section 1127c. We observed that such an instruction would invite speculation; there are plausible reasons why a guilty person might refrain from flight. [Citation.] Our conclusion therein also forecloses any federal or state constitutional challenge based on due process." (*Staten,* at p. 459; see also *People v. Williams* (1997) 55 Cal.App.4th 648, 652 (*Williams*).)

Section 1127c explains that: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] *No further instruction on the subject of flight need be given*." (Italics added.) There is no similar statutory requirement that the court must instruct the jury on the absence of flight.

In *Green, supra,* 27 Cal.3d 1, the court noted that evidence of the absence of flight has been held to be inadmissible under Evidence Code section 352 as so ambiguous and laden with conflicting interpretations that its probative value on the issue of innocence is slight. (*Id.* at p. 39.) The *Green* court concluded that, even though there was evidence presented to show the absence of flight, the court was not required to instruct on the absence of flight because the instruction would have injected a new issue into the jury's deliberations and invited speculation. (*Ibid.*, fn. omitted.) "[T]he inference of consciousness of guilt from flight is one of the simplest, most compelling and universal in human experience. [Citation.] The absence of flight, on the other hand, is far less relevant, more inherently ambiguous and 'often feigned and artificial.' [Citation.]" (*Williams, supra*, 55 Cal.App.4th at p. 652.)

As concluded in *Williams, supra*, 55 Cal.App.4th at page 653, due process does not require instruction on evidence of absence of flight because "there is no fundamental unfairness in not requiring an instruction on the absence of flight. . . . Since flight and the absence of flight are not on similar logical or legal footings, the due process notions of fairness and parity . . . are inapplicable." Here, we likewise conclude there was no due process requirement that the court instruct the jury on the absence of flight.

XI

DANGEROUS FELONY INSTRUCTION

Ricardo contends the trial court erred in instructing the jury it could convict Ricardo of first degree murder if the jury found the murder was committed in the course of a dangerous felony. Ricardo argues that this instruction created an unconstitutional

41

presumption of guilt, lightened the prosecution's burden of proof beyond a reasonable doubt, and violated his Sixth Amendment right to counsel by instructing the jury that it could convict him merely upon finding he committed a dangerous felony.

The prosecution argued three theories of first degree murder: (1) premeditated murder, (2) lying-in-wait murder, and (3) felony murder. Ricardo asserts that the trial court erroneously instructed the jury that defendant "had been prosecuted for first degree murder under three theories: (1) the murder was willful, deliberate, and premeditated, (2) the murder was committed by lying in wait, and (3) the murder was committed during the commission of a dangerous felony." Ricardo argues that there is no legally recognized "dangerous felony" theory of first degree murder.

Ricardo further argues that the instructional error was prejudicial beyond a reasonable doubt under *Chapman, supra,* 386 U.S. at page 24, because the verdict form for first degree murder does not reveal whether the jury found Ricardo guilty based on a predicate felony that could support a proper felony-murder conviction, such as robbery or carjacking. Ricardo notes that the jury rejected the robbery special circumstance allegation and argues that there was no evidence of intent to kill. There was only evidence Ricardo planned to beat up Mark. Therefore the jury could not have found premeditated murder or felony murder, and the instruction permitted the jury improperly to find Ricardo guilty of first degree murder based on a lower standard of proof; that of finding him guilty merely based on finding he aided and abetted commission of a "dangerous felony," such as a section 246 violation.

42

Ricardo argues that, because the dangerous felony theory is not a proper first degree murder theory, including it in CALCRIM No. 521 as one of three theories constituting first degree murder, impermissibly lightened the People's burden of proving first degree murder beyond a reasonable doubt, undercut the presumption of innocence, and triggered per se reversal. We reject this contention because the instructions as a whole adequately instructed the jury on the elements and theories required for a first degree murder. Even assuming CALCRIM No. 521 should have specified that the predicate "dangerous felony" offenses for felony murder were limited to robbery and carjacking, the other instructions defining first degree murder and felony murder made it clear that first degree murder was limited to (1) premeditated murder, (2) lying-in-wait murder, and (3) felony murder, in which the predicate offenses were limited to robbery and carjacking.

We also conclude that any error in including in CALCRIM No. 521 the theory of committing a dangerous felony, was harmless error beyond a reasonable doubt under *Chapman, supra,* 386 U.S. at page 24. The alleged instructional error simply "did not contribute to the verdict obtained." (*Ibid.*) In addition to giving CALCRIM No. 521, the trial court gave CALCRIM No. 540B, defining the elements of first degree murder; CALCRIM No. 541B, defining the elements of second degree murder; modified CALCRIM No. 548, identifying the three applicable first degree murder theories; and modified CALCRIM No. 570, regarding voluntary manslaughter based on a section 246 violation. It is not reasonably likely the jury would have construed these instructions, when considered as a whole, as allowing the jury to find Ricardo guilty of first degree

43

murder based on a finding he aided and abetted in shooting at an occupied vehicle, in violation of section 246. The jury instructions stated that a section 246 violation, for shooting at an occupied car, was only a predicate crime for voluntary manslaughter and second degree felony murder. It is not reasonably likely the jury would have construed the language in CALCRIM No. 521, referring to murder committed during a dangerous felony, as allowing the jury also to convict Ricardo of first degree murder based on a section 246 violation.

In addition, if there was any ambiguity in the instructions in this regard, the prosecutor clarified during closing argument that, in order to find Ricardo guilty of first degree murder, the jury must find that the killing was committed during a robbery or carjacking. Finally, use of the language, "dangerous felony" in CALCRIM No. 521 was harmless, since the jury found true the special circumstance allegation of lying in wait. This reflects that the jury would have found Ricardo guilty of first degree murder based on the theory of lying in wait, even if CALCRIM No. 521 had not included the language, "dangerous felony."

To the extent Denetric joins in Ricardo's challenge to CALCRIM No. 521, we reject his objection for the same reasons discussed above. Furthermore, as to Denetric, the jury found true the additional special circumstance of robbery, which reflects that the jury found Denetric guilty of first degree murder based on both lying in wait and felony murder.

## XII

## LYING-IN-WAIT SPECIAL CRICUMSTANCE

Ricardo contends the trial court committed prejudicial error when it erroneously modified CALCRIM No. 703 on special circumstances to refer to both felony-murder and lying-in-wait special circumstances. Normally, the standard CALCRIM No. 703 instruction only refers to the felony-murder special circumstance. This is because the instruction allows the jury to find true the felony-murder special circumstance if the defendant acted either with intent to kill or with reckless indifference to human life. Finding true the lying-in-wait special circumstance requires intent to kill. A finding of reckless indifference to human life is not sufficient. Ricardo argues that CALCRIM No. 703, as modified, allows the jury to find true the lying-in-wait special circumstance without a finding of intent to kill.

We conclude modified CALCRIM No. 703 does not constitute prejudicial error because it is not reasonably likely the instructions as a whole would mislead the jury in construing CALCRIM No. 703 as allowing the jury to find true the special circumstance of lying in wait in the absence of intent to kill. This is because when the trial court read to the jury CALCRIM No. 703, the court began by stating the title of CALCRIM No. 703, as follows: "SPECIAL CIRCUMSTANCES: INTENT REQUIREMENT FOR ACCOMPLICE FELONY MURDER," indicating the instruction was limited solely to special circumstance of felony murder.

Ricardo argues that use of the words, "special circumstances," in the plural, in CALCRIM No. 703, likely mislead the jury into construing CALCRIM No. 703 as

45

applying to both the felony-murder and lying-in-wait special circumstances, whereas the instruction should only apply to the felony murder special circumstance. We do not find this argument persuasive since the title of the instruction clearly states that the instruction applied only to accomplice felony murder.

CALCRIM No. 705 further explained that, "In order to prove the special circumstances, the People must prove not only that the defendant did the acts charged, but also that he or she acted with a particular intent or mental state. The instruction for each special circumstance explains the intent or mental state required." CALCRIM No. 703 explained the intent required for the felony-murder special circumstance. CALCRIM No. 728, entitled, "SPECIAL CIRCUMSTANCES: LYING IN WAIT," stated the intent or mental state required for the lying-in-wait special circumstance. CALCRIM No. 728 stated in relevant part: "The defendant is charged with the special circumstance of murder committed by means of lying in wait. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Mark Enoch; and [¶] 2. The defendant committed the murder by means of lying in wait." This instruction clearly states that in order to find true the lying-in-wait special circumstance, the jury was required to find intent to kill.

The prosecutor's closing argument further clarified that the lying-in-wait special circumstance required a finding that Ricardo had an intent to kill Mark. The prosecutor stated with regard to the lying-in-wait special circumstance, "He had to have intended to kill Mark Enoch for this to apply. [¶] . . . [¶] Under the special circumstance, now the law adds in an intent to kill. So you're going to have to make those determinations if at

46

the moment in time that Ricardo Lagunas is hiding behind that wall, has he decided to kill. When he rushes out with the loaded gun and pulls the trigger at Mark Enoch, has he decided to kill at that moment."

Taking into consideration the instructions as a whole, as well as the prosecutor's closing argument, it is not reasonably likely the jury would have construed CALCRIM No. 703 as allowing the jury to find true the lying-in-wait special circumstance without a finding of intent to kill.

## XIII

## DISPOSITION

The judgments against Vanessa Lagunas, Ricardo Lagunas, and Denetric Adams are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

MILLER

J.